<u>**CLOSING**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CHAMBERS OF**<br>**MADELINE COX ARLEO**<br>**UNITED STATES DISTRICT JUDGE** | **MARTIN LUTHER KING COURTHOUSE**<br>**50 WALNUT ST. ROOM 4066**<br>**NEWARK, NJ 07101**<br>**973-297-4903** |

June 28, 2024

<u>VIA ECF</u>

<u>**LETTER ORDER**</u>

Re:   <u>Silva, et al. v. Evonik Corp., et al.</u>
    <u>Civil Action No. 20-02202</u>

Dear Litigants:

Before the Court is Evonik Corporation ("Evonik"), the President of Evonik ("President"), the Board of Directors of Evonik (the "Board"), and the Evonik Investment Committee's ("IC") (collectively, "Defendants") Motion for Summary Judgment (the "Motion"). ECF No. 86. Plaintiffs Stehle Harris and David Elliot ("Plaintiffs") oppose the Motion. ECF No. 89. For the reasons explained below, Defendants' Motion is **GRANTED**.

**I.   BACKGROUND**[1]

This putative ERISA class action arises out of Defendants' selection and maintenance of investment options offered by Evonik's 401(k) Savings Plan ("The Plan"). Plaintiffs—former employees of Evonik and participants in the Plan—assert that Defendants have failed to adequately monitor the Plan to ensure that its investment options and costs were financially prudent.

Plaintiffs seek to recover damages under ERISA for (1) IC's alleged breach of the duty of prudence (Count I); and (2) Evonik, the President, and the Board's alleged breach of the duty to monitor other fiduciaries in their selection and maintenance of investment options offered by the Plan (Count II). <u>See</u> ECF Nos. 25, 46.

---

[1] Unless otherwise indicated, the Court draws the following facts from Defendants' Statement of Undisputed Material Facts ("Defendants' SUMF"), ECF No. 86.1, Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts and Counter Statement of Material Facts ("Plaintiffs' SUMF"), ECF No. 90, and Defendants' Reply to Plaintiffs' Response to Defendants' Statement of Facts and Response ("Defendants' RSUMF"), ECF No. 93.6. The Court will not consider any statements made in these filings that are unsupported, conclusory allegations. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986) (A non-moving party must go "beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, [and] designate specific facts showing that there is a genuine issue for trial" to survive a motion for summary judgment.) (internal quotation marks omitted). The Court cites only to Defendants' SUMF for undisputed facts and otherwise notes any disputes.

Evonik sponsors its 401(k) Savings Plan, a defined contribution plan that provided retirement benefits to eligible employees. Defs.' SUMF ¶ 2, 38. [2] From 2013 through 2022, the Plan had between about $623 million and $1.38 billion in assets and between about 4,817 and 6,299 members. Id. ¶¶ 39–40. Plaintiffs bring this action on behalf of all participants and beneficiaries of the Plan from February 28, 2014, to present (the "Class Period"). Id. ¶ 25.

Participants had three avenues for building their portfolio. First, they could construct their own portfolio from the core menu of investment options, which included "actively and passively managed mutual funds and separate accounts in major asset classes." Id. ¶¶ 48–49. Second, they could open self-directed brokerage accounts. Id. ¶ 55. Third, they could use GoalMaker, an optional asset allocation tool that allowed participants to construct diversified portfolios based on the core options in the Plan. Id. ¶¶ 50–52. GoalMaker also served as the Plan's qualified default investment alternative ("QDIA")—a default investment for participants. Id. ¶ 51. Accordingly, participants who did not make active investment choices were invested in GoalMaker's moderate portfolio based on the individual's age range. Id. The Plan's overall expense to participants—including investment fees, administrative expenses, and recordkeeping fees—is reflected in a measurement called Total Plan Costs ("TPC").

### A. IC and the Investment Policy Statement

For management of the Plan's investments and recordkeeping fees, the Board created IC. Id. ¶ 33. IC had "fiduciary authority and discretion to select and monitor the Plan's investments and monitor the reasonableness of the Plan's fees." Id. In doing so, IC used an Investment Policy Statement (the "IPS") for investment management, which had "watch list criteria" including "review of benchmark performance as well as risk-adjusted performance, investment objectives, manager changes, and expense ratios compare[d] to category averages." Id. ¶ 62–63.

During the Class Period, the Plan engaged the investment consultant entity Fiducient (formerly known as DiMeo Schneider and Associates, and prior to that, Fidicuary Investment Advisors), which prepared Quarterly Investment Reviews ("QIR") summarizing data and reports on investments in the Plan, including their performance and fees. Id. ¶ 56, 58. Fiducient presented and discussed the QIRs at each quarterly IC meeting, conducted annual reviews focusing on plan fees, including recordkeeping fee benchmarking and Plan investments, and provided "additional services as needed, such as managing requests for information ("RFIs") for recordkeeping services." Id. ¶¶ 59–61. The QIRs provided by Fiducient to IC members included general information about market conditions as well as specific information regarding the Plan's investment, such as asset allocation, fees, and performance against industry benchmarks. Id. ¶ 66. Fiducient maintained a watchlist where each investment option in every QIR was given a rating of "maintain," "watch," "discuss," or "terminate." Id. ¶ 69.

---

[2] "[A] 'defined contribution plan' . . . promises the participant the value of an individual account at retirement, which is largely a function of the amounts contributed to that account and the investment performance of those contributions." LaRue v. DeWolff, Boberg & Assocs., Inc., 552 U.S. 248, 250 n.1 (2008) (citing 29 U.S.C. § 1002(34)).

### B. Investigation and Selection of Investments

Plaintiffs' claim that Defendants breached their duty of prudence relies primarily on their expert, Eric Dyson ("Dyson"). See generally Dyson Rep., ECF No. 86.5.

#### i. Fund Performance

In opining on fund performance, Dyson asserts that the "Plan's menu of investments was imprudent" but only discusses two funds: the Fort Washington Large Cap Core Fund ("Fort Washington")[3] and the Artisan Partners International Growth Fund ("Artisan"). Defs.' SUMF ¶ 108; Pls.' SUMF ¶¶ 106–07.

During the Class Period, the Fort Washington fund had periods of over- and under-performing its benchmark index. Defs.' SUMF ¶ 83. It was marked with a "watch" status by Fiducient in August 2017; returned to "maintain" status following an IC discussion; moved back to "watch" status by the Fiducient at a Q3 2019 IC meeting because of its underperformance of its benchmark index, which had not rebounded in light of market conditions; and then, in August 2019, was replaced by IC with a different fund. Id. ¶¶ 84–87.

The Artisan fund, which could be invested on its own or through GoalMaker, had periods of over- and under-performing its benchmark index, and was discussed at IC meetings. Id. ¶¶ 90–92. Fiducient reported to IC that the Artisan fund, even during periods of underperformance, typically rebounded, but assigned Artisan a status of "discuss" for performance reasons for Q4 2020. Id. ¶¶ 93–94. In September 2021, IC held an off-cycle meeting to discuss, among other things, a recommendation regarding the Artisan fund because a shift in investment strategy made it duplicative of other funds; IC thereafter replaced the fund. Id. ¶¶ 95–97. IC did not retain the Fort Washington or the Artisan funds over Fiducient's objection or advice. Id. ¶¶ 88, 98.

Dyson considered the two funds' impact on GoalMaker and on the overall portfolio performance. Pls.' SUMF ¶ 100. Relying on Dyson's findings, Plaintiffs state that IC was "aware the challenged funds repeatedly fell short of passive benchmark performance in their respective categories including 2015 and the three year and five-year marks." Id. ¶ 78. According to Plaintiffs, "the challenged funds were economically unreasonable based on poor returns and should have been removed from [the] Plan earlier." Id. ¶ 99.

#### ii. TPC and Investment Fees

The Plan's TPC included investment fees, administrative expenses, and recordkeeping fees. Plaintiffs claim that (1) the Plan had high TPC and (2) such high TPC indicates that the investment fees were excessive.

Dyson generally opines that IC's selection of higher cost shares was one of several failures of the Plan, resulting in high TPC. See generally Dyson Rep. Indeed, Plaintiffs assert that "[d]uring the Class Period, the Plan maintained several funds that had lower costs, but otherwise identical, share class versions." Pls.' SUMF ¶ 165. In response, Defendants explain that while IC

---

[3] The Fort Washington fund was previously called the Sentinel Common Stock fund. Defs.' SUMF ¶ 82.

opted for higher <u>gross</u> cost share classes for some funds, they did so to collect revenue sharing that eventually resulted in an overall lower <u>net</u> cost. Defs.' RSUMF ¶ 165. Specifically, Defendants state that such revenue was used to pay the Plan's administrative expenses and recordkeeping fees (but not investment fees), thus defraying the Plan's overall costs. <u>Id.</u>; <u>see also</u> Defs.' SUMF ¶¶ 119–20.

### C. Monitoring Recordkeeping Fees

The Plan used Prudential Retirement Insurance and Annuity Company ("Prudential") as its recordkeeper. Defs.' SUMF ¶ 112. As such, Prudential provided administrative services necessary for 401(k) plan management. <u>Id.</u> ¶ 113. Between 2014 and 2022, the Plan's recordkeeping fees decreased from $116 to $49.50 and, until December 2019, were paid in part by using revenue sharing collected from the Plan's investments. <u>Id.</u> ¶¶ 115, 119. For IC's review, Fiducient conducted a review of such fees and used Prudential's data to produce annual benchmarks. <u>Id.</u> ¶ 122. Fiducient never reported that the Plan's recordkeeping fees were unreasonable. <u>Id.</u> ¶ 144.

In 2021, Fiducient conducted a blind Request for Information ("RFI") for recordkeeping services. It sent a blind fee questionnaire to four recordkeepers, each of which submitted four tiers of price proposals. <u>Id.</u> ¶¶ 125–27. As a threshold consideration, IC did not want to eliminate GoalMaker as the Plan's QDIA or its stable value fund. <u>Id.</u> ¶¶ 128–29. Therefore, IC focused on each provider's Tier One bids for recordkeeping fees.[4] <u>Id.</u> Tier One bids were for open architecture pricing, meaning that the Plan was not required to use the recordkeeper's proprietary products and services and could continue to use GoalMaker or its stable value fund. <u>Id.</u> ¶¶ 127–28. Plaintiffs assert that Defendants should not have limited their focus to only Tier One bids and should have negotiated for lower fees. Pls.' SUMF ¶ 129.

### II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), the Court will grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Celotex Corp.</u>, 477 U.S. at 322. "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." <u>Miller v. Ind. Hosp.</u>, 843 F.2d 139, 143 (3d Cir. 1988).

The Court construes all facts and inferences in the light most favorable to the non-moving party. <u>Peters v. Del. River Port Auth.</u>, 16 F.3d 1346, 1349 (3d Cir. 1994). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 248 (citing <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288–89 (1968)) (internal quotation marks omitted).

---

[4] Tier One bids for recordkeeping services fees ranged from $41–$54 per participants per year. Defs.' SUMF ¶ 130. Within those bids, two providers offered higher than the Plan's fees and two providers offered lower than the Plan's fees. <u>Id.</u> ¶ 131–32.

III.     ANALYSIS

The Employee Retirement Income Security Act of 1974 ("ERISA") statute was created as "a response to 'the lack of employee information and adequate safeguards concerning [employee benefit plans'] operation,'" and "reflects Congress's desire 'that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans.'" Sweda v. Univ. of Penn., 923 F.3d 320, 326–27 (3d Cir. 2019) (citing 29 U.S.C. § 1001(a)). ERISA imposes a "prudent person" standard of care on fiduciaries. See 29 U.S.C. § 1104(a)(1)(B).

"A claim for fiduciary breach has three elements: (1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan." McCaffree Fin. Corp. v. ADP, Inc., No. 20-5492, 2023 WL 2728787, at *13 (D.N.J. Mar. 31, 2023) (internal citations omitted). The Parties do not dispute whether there is a plan fiduciary and instead dispute whether an ERISA-imposed duty was breached and whether that breach resulted in loss to Plaintiffs.

### A.     Duty of Prudence

Plaintiffs fail to raise a triable issue of fact as to whether IC breached its fiduciary duty of prudence by failing to (1) investigate or select investments with lower costs or (2) monitor recordkeeping fees.

An ERISA fiduciary is held to the "prudent person" standard of care and thus must exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Put simply, the duty of prudence requires a fiduciary to diligently monitor investments. See Tibble v. Edison Int'l, 575 U.S. 523, 530 (2015) (defining breach of duty of prudence as "failing to properly monitor investments and remove imprudent ones"); Cunningham v. Cornell Univ., 86 F.4th 961, 983 (2d Cir. 2023) (same); In re Omnicom Grp. Inc. Erisa Litig., No. 20-4141, 2022 WL 18674830, at *16 (S.D.N.Y. Dec. 23, 2022) (citing Tibble, 575 U.S. at 529) (finding that an ERISA fiduciary "must review investments at 'regular intervals.'").

In assessing this duty, courts look at a fiduciary's "process rather than results," considering "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular statement." Sweda, 923 F.3d at 329. Such inquiry must evaluate the circumstances present at the time the fiduciary acted. See Hughes v. Nw. Univ., 595 U.S. 170, 177 (2022); see also McCaffree, 2023 WL 2728787, at *13 ("Hindsight indeed is 20/20, so the focus must be on a fiduciary's conduct in arriving at a decision") (internal citations omitted); Falberg v. Goldman Sachs Grp., Inc., No. 19-9910, 2022 WL 4280634, at *11 (S.D.N.Y. Sept. 14, 2022) ("[T]he central question is whether a prudent fiduciary in like circumstances would have acted differently."), aff'd, No. 22-2689, 2024 WL 619297 (2d Cir. Feb. 14, 2024).[5]

---

[5] In evaluating the duty of prudence, the Third Circuit has also recognized an objective standard irrespective of process. See Renfro v. Unisys Corp., 671 F.3d 314, 322 (3d Cir. 2011) ("[W]e have also approved of an approach examining whether a questioned decision led to objectively prudent investments."). In other words, even if a fiduciary failed to properly investigate, it cannot be held liable if the investments were objectively reasonable. See id. (citing cases).

### 1. Investigation and Selection of Investments

Defendants put forward undisputed facts, which Plaintiffs do not plausibly challenge, showing that IC acted prudently in investigating and selecting investments.

#### i.  IC's Process

The Court finds that IC's process for monitoring investments was diligent. It is undisputed that the Plan engaged Fiducient[6]—which, prior to quarterly meetings IC, prepared and distributed reports containing information on Plan investments' asset allocations, fees, and performance against industry benchmarks. Defs.' SUMF ¶¶ 58–59. The reports contained, among other things, a watchlist that assigned investment options ratings, including those to "watch," "discuss," or "terminate" at IC meetings, and undisputed evidence shows that the committee discussed such investments, even having an off-cycle meeting to discuss the Fiducient's recommendation to remove a fund. Id. ¶¶ 69, 83–87, 95–97.[7]

IC's oversight here is comparable to that of other fiduciaries, whose processes were found to be "deliberative and rigorous." See, e.g., Falberg v. Goldman Sachs Grp., Inc., No. 22-2689, 2024 WL 619297, at *3 (2d Cir. Feb. 14, 2024) (affirming summary judgment where undisputed evidence revealed that "[t]he Committee's independent advisor continually monitored and evaluated the [p]lan's investment options, and provided the Committee members with detailed information, including monthly and quarterly performance reports" and where "Committee members reviewed those reports prior to attending Committee meetings") (internal citations to record omitted). Given the thoroughness of Fiducient's reports and the frequency of committee meetings, the Court is satisfied that IC had a prudent process with respect to investments.

#### ii.  The Investment Policy Statement

Plaintiffs assert that the vagueness of and lack of detail in the IPS preclude a finding that IC acted with the requisite prudence. The Court disagrees.

Where undisputed evidence demonstrates a prudent process, Plaintiffs cannot argue that vague or imprecise aspects of the IPS indicate imprudence. In Falberg, the court, looking to the defendant's process, affirmed summary judgment where the plaintiff alleged that the defendant-committee could not properly scrutinize funds without an IPS. Id. The court found that the plaintiff failed to "point to any evidentiary basis for concluding that a prudent fiduciary would

---

[6] The ERISA duty of prudence does not expect that fiduciaries "duplicate their advisers' investigative efforts" and instead requires that they "review the data a consultant gathers, to assess its significance and to supplement it where necessary." In re Unisys Sav. Plan Litig., 74 F.3d 420, 435 (3d Cir. 1996). In fact, appointing an investment advisor is evidence of "thorough investigation" and "procedural prudence and proper monitoring." Cunningham v. Cornell Univ., No. 16-6525, 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 27, 2019) (internal quotation marks omitted) (citing DiFelice v. U.S. Airways, Inc., 49 F.3d 410, 421 (4th Cir. 2007)), aff'd, 86 F.4th 961 (2d Cir. 2023).

[7] This evidence undermines Plaintiffs' duty of prudence claim. See Cunningham, 2019 WL 4735876, at *14 ("Evidence of discussions about the pros and cons of investment alternatives is fatal to plaintiffs' [imprudent fiduciary] claims.") (internal quotation marks omitted) (citing Tibble v. Edison Int'l, 729 F.3d 1110, 1136 (9th Cir. 2013), vacated on other grounds, 575 U.S. 523 (2015)).

have necessarily adopted an IPS" and noted that the plaintiff even conceded that an IPS is not required for a finding that a fiduciary acted prudently. Id. Here, the evidence is even more favorable for Defendants: not only did an IPS exist, but it provided guidelines for monitoring the Plan's investments, including criteria to evaluate investments and procedures for handling investments of concern. Defs.' SUMF ¶ 62. Importantly, the IPS contained specific watchlist criteria, including reviews of benchmark performance. Id. ¶ 63.[8]

To the extent that Plaintiffs argue the IPS lacked certain criteria—such as a specific time frame for evaluating fund performance and inclusion of certain asset classes—those details were adequately captured in the QIR meetings between IC and Fiducient. See id. ¶¶ 65–72. Therefore, the IPS does not support a finding of breach.

### iii. TPC and Investment Fees

Plaintiffs argue that the Plan's high TPC indicates that the Plan's investment fees were excessive, and thus a breach of Defendants' duty of prudence. See Pls.' Opp'n. at 8. The Court disagrees.

It is undisputed that Defendants offered actively managed funds through GoalMaker and that the Plan's TPC was higher as a result. Defs.' RSUMF ¶ 152. Offering actively managed funds is not in itself imprudent and commonly results in higher fees. See Smith v. CommonSpirit Health, 37 F.4th 1160, 1163 (6th Cir. 2022) (noting that actively managed funds typically charge higher fees because of the "considerable judgment and expertise" required in their management).

Plaintiffs cannot create a fact issue on prudence by evaluating fees for the entire Plan, as opposed to a specific fund. See Pls.' SUMF ¶ 151. Indeed, "a meaningful comparison offered in support of imprudence by fiduciaries must take account of the separate goals and separate risk profiles of the funds at issue." Matney v. Barrick Gold of N. Am., 80 F.4th 1136, 1147 (10th Cir. 2023) (internal quotation marks and citations omitted). In the context of investment fees, a meaningful comparison will assess whether alternative investment options have strategies, objectives, or risk profiles similar of that of the plan's funds. See id. at 1148. Here, Plaintiffs cannot use the Plan's TPC in lieu of a fund-specific analysis. See McCaffree, 2023 WL 2728787, at *15 ("[T]he fact that the Plan's total plan costs are higher than average does not on its own create an inference that Defendants breached their duty of prudence."). This is especially true given that (1) the Plan's TPC included not just investment fees, but also administrative expenses (which are not at issue here) and recordkeeping fees, and (2) Defendants used revenue sharing to lower the Plan's total net cost. Plaintiffs' evidence, which is based only on overall Plan fees, does not present a triable issue regarding investment fees.

---

[8] Plaintiffs cite to Omnicom to argue that the IPS did not contain specific enough criteria for replacing or removing investment funds. But in Omnicom, the court found that the plan at issue "did not include any specific or standardized guidelines for the removal or replacement of investment funds or the placement of investment funds on a watch list." 2022 WL 18674830, at *16 (emphasis added). By contrast, here the IPS contained specific watchlist criteria.

### iv. The Fort Washington and Artisan Funds

Plaintiffs assert that there is a genuine dispute of material fact as to whether the Fort Washington and Artisan funds—which supposedly "fell short of passive benchmark performance"—were removed in a reasonable time. Pls.' Opp'n. at 18. The Court disagrees.

Fatal to Plaintiffs' claims is that IC utilized a prudent process, specifically analyzing and discussing both funds with Fiducient at committee meetings. See Defs.' SUMF ¶¶ 83–87, 93–97; supra Section III.A.1.i. Throughout the process, IC followed the advice of Fiducient and eventually sold the Fort Washington and Artisan funds in August 2019 and September 2021, respectively. See id. ¶¶ 87, 97. Plaintiffs argument that for years Defendants merely conducted meetings and reviews and ignored "alarming information" is unsupported by the factual record.

Process aside, the funds' benchmark performance does not present a triable issue of fact for at least two reasons.[9] First, Plaintiffs' assertion that the Fort Washington and Artisan funds fall short of their benchmarks does not indicate that a prudent fiduciary, even knowing of the funds' underperformance, would have removed the funds sooner. See Jenkins v. Yager, 444 F.3d 916, 926 (7th Cir. 2006) (citing DeBruyne v. Equitable Life Assurance Soc. of the United States, 920 F.2d 457, 465 (7th Cir. 1990)) ("[I]nvestment losses are not proof that an investor violated his duty of care."); see also Cunningham, 2019 WL 4735876, at *11 ("Long-term investment options, like those offered in a retirement plan, may have varying levels of performance over the course of time."). Second, both funds had points where they exceeded their benchmarks as well. Defs.' SUMF ¶¶ 83, 91. Any discrepancy in benchmark performance cannot, on its own, support a finding of imprudence. See Smith, 37 F.4th at 1167 (finding that while "an after-the-fact performance gap between benchmark comparators . . . may offer a building block for a claim of imprudence" it does not "by itself violate[] the process-driven duties imposed on ERISA fund managers").

The Court therefore grants summary judgment as to IC's selection and maintenance of investments. Because there is no breach of duty, the Court need not consider whether Plaintiffs sustained any loss.

### 2. Monitoring Recordkeeping Fees

The undisputed facts show that IC acted prudently in monitoring the Plan's recordkeeping fees.

### i. IC's Process

It is undisputed that Fiducient, as part of the Plan fee review, conducted annual fee benchmarking throughout the Class Period. See Defs.' SUMF ¶ 122. During this time, Fiducient never reported that the recordkeeping fees were unreasonable. Id. ¶ 144. In fact, throughout the

---

[9] The Court further notes that Plaintiffs compare the two funds to benchmark indices compiled in 2022. See Dyson Rep. ¶ 59; see also id. Ex. C. But that data was unavailable to IC when it made its decision to retain the funds, see Defs.' Br., ECF No. 86.2, at 12, and such 20/20 hindsight cannot be used to impose liability, see In re Unisys Sav. Plan Litig., 74 F.3d at 432.; see also supra Section III.A (citing cases).

Class Period, the recordkeeping fees decreased significantly. Id. ¶ 115.[10] And in 2021, IC conducted an RFI for recordkeeping services, soliciting bid proposals from certain providers. Id. ¶ 125. These undisputed facts demonstrate that IC's process in evaluating the Plan's recordkeeping fees was prudent. See Omnicom, 2022 WL 18674830, at *16 (citing Chao v. Merino, 452 F.3d 174, 182 (2d Cir. 2006)) ("ERISA does not dictate 'any particular course of action' with regards to fees, but it does require a 'fiduciary . . . to exercise care prudently and with diligence under the circumstances then prevailing.'").

*ii.    The Plan's Recordkeeping Fees*

Plaintiffs argue, using IC's own benchmarking from the 2021 RFI, that the Plan could have negotiated a $23 per participant recordkeeping fee and therefore did not conduct a competitive bidding process. See Pls.' Opp'n. at 29. The Court disagrees.

Defendants explain that in soliciting recordkeeping pricing, IC requested four different pricing tiers based on different plan types, and that the $23 price came from a Tier Four proposal—requiring changes to its stable value fund and GoalMaker as the Plan's QDIA—as opposed to the Tier One open architecture pricing plan, where the Plan was not bound to the use the Recordkeeper's property products. Defs.' SUMF ¶¶ 127–128. IC did consider the alternate fee tiers as well as lower costs offered in the same tier by certain providers—but decided to remain with its recordkeeper because it felt that "the minimal cost savings that could have been achieved . . . would have been offset by the risk of error . . . and disruption to Evonik." Id. ¶ 133.

As an initial matter, this evidence does not suggest a breach of a duty of prudence. See Albert v. Oshkosh Corp., 47 F.4th 570, 579 (7th Cir. 2022), reh'g denied, No. 21-2789, 2022 WL 4372363 (7th Cir. Sept. 21, 2022) ("[T]he cheapest investment option is not necessarily the one a prudent fiduciary would select."); McCaffree, 2023 WL 2728787, at *14 (citing Ramos v. Banner Health, 461 F. Supp. 3d 1067, 1132 (D. Colo. 2020) (finding that "[a] high fee alone does not mandate a conclusion that recordkeeping fees are excessive; rather, fees must be evaluated relative to the services rendered.") (internal citations omitted), aff'd, 1 F.4th 769 (10th Cir. 2021)). Defendants properly considered each provider's bids and the consequences of each.

Plaintiffs seem to have two responses to the fact that the $23 bid would have required Defendants to change the Plan's services. First, they argue that the Plan may not have needed to eliminate GoalMaker as the QDIA had they negotiated and explored the providers' responses further. The Court finds this argument too speculative to pose a triable issue of fact. See Torretti v. Main Line Hosps., Inc., 580 F.3d 168, 179 n.16 (3d Cir. 2009); Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 666 (3d Cir. 2016).

Second, to the extent Plaintiffs suggest that Defendants should have been willing to change the Plan's QDIA or stable value fund, they did not set forth any evidence showing that such a change would have had a de minimis impact on the Plan. Defs.' RSUMF ¶ 183. To the contrary,

---

[10] Irrespective of process, courts have found that an overall decrease in recordkeeping fees supports a finding of objective prudence. See Nunez v. B. Braun Med., Inc., No. 20-4195, 2023 WL 5339620, at *12 (E.D. Pa. Aug. 18, 2023) (finding objective prudence in part because "recordkeeping fees per participant largely experienced a downward trajectory"); see also supra note 5.

9

changing the Plan's services would have required IC to incorporate certain assets and, according to Defendants, thereby replace most of its investments. Id.; Dyson Dep. Tr., ECF No. 86.17, 131:8–11. A fiduciary need not accept drastic changes to the plan simply to attain the lowest fee. See Nunez, 2023 WL 5339620, at *11 (finding it reasonable for the fiduciary to maintain open architecture pricing because the alternative would require dramatic changes that "may not have been worth the ultimate savings in recordkeeping expenses"). The Court finds that Defendants' decision to keep the Plan's QDIA and stable value fund was reasonable and, therefore, the $23 fee cannot serve as a meaningful benchmark.

The Court therefore grants summary judgment with respect to IC's monitoring of recordkeeping fees. Because there is no breach of duty, the Court need not evaluate loss.

### B. Duty to Monitor Other Fiduciaries

Plaintiffs assert that Evonik, the President, and the Board breach their duty to monitor IC in their selecting and maintaining investment options and monitoring of recordkeeping fees. See generally Am. Compl., ECF No. 46. But Plaintiffs "cannot maintain a claim for breach of the duty to monitor absent an underlying breach of the duties imposed under ERISA." Falberg, 2024 WL 619297, at *4 (citing Rinehart v. Lehman Bros. Holdings Inc., 817 F.3d 56, 68 (2d Cir. 2016)). Because the Court finds no breach of prudence with respect to IC, the Court grants summary judgment as to Plaintiffs' duty to monitor claim.

### IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment, ECF No. 86, is **GRANTED**. This case is hereby **CLOSED**.

SO ORDERED.

*s/ Madeline Cox Arleo*
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**